# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MARK ENGEL,**

    **Plaintiff,**

    **v.**                                    **Case No. 20-CV-1206-SCD**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

Mark Engel applied for social security disability benefits based on vision impairments and a disease that he alleges caused disabling muscle weakness and fatigue. After a hearing, an administrative law judge denied Engel's claim, finding that although he had severe physical impairments, he was still capable of performing sedentary work with certain physical limitations. Engel seeks judicial review of that decision, arguing that the ALJ erred in evaluating Engel's residual functional capacity—that is, his maximum capabilities despite his limitations—and in finding that there were a sufficient number of jobs he could perform with that RFC. Because substantial evidence supports the ALJ's decision and Engel has failed to demonstrate that the ALJ committed an error of law in reaching his decision, I will affirm the denial of disability benefits.

## BACKGROUND

In November 2017, Engel applied for disability insurance benefits, alleging that he became disabled on January 28, 2016. R. 191–98.[1] Engel asserted that he was unable to work due to several eye impairments, fatigue, memory issues, and anxiety. R. 230. He alleged that he was unable to lift or move things at a fast pace, that he couldn't lift more than thirty pounds, and that he tired quickly. R. 239. He further alleged that he had no issues with personal care; he did some household chores (like his own laundry and cleaning his own room); he drove; he went grocery shopping; he enjoyed reading, watching television, listening to music, and working on computers; and he went to church once a week, but that his mother cooked all his meals. *See* R. 239–46. According to Engel, his impairments impacted his ability to lift, squat, bend, climb stairs, and complete tasks. R. 244.

The Social Security Commissioner denied Engel's applications initially and upon reconsideration. *See* R. 52–79. Ronald Shaw, MD, the state-agency medical consultant who reviewed the record at the initial level of review, opined that, despite suffering from severe physical impairments, Engel could still perform a reduced range of light work. R. 55–62. Specifically, Dr. Shaw opined that Engel's field of vision was limited in both eyes, that Engel should avoid concentrated exposure to extreme cold, and that Engel should avoid even moderate exposure to hazards like heavy machinery and unprotected heights. R. 59–60. Nosheen Muzaffar, MD, reviewed the record for the state agency upon Engel's request for reconsideration. *See* R. 68–78. Dr. Muzaffar opined that Engel could perform a reduced range of sedentary work, including standing or walking for only four hours out of an eight-hour workday; limited pushing and pulling in both upper and lower extremities; frequent kneeling

---

[1] The transcript is filed on the docket at ECF No. 13-2 to ECF No. 13-8.

and crouching; only occasional crawling and climbing ramps and stairs; no balancing or climbing ladders, ropes, or scaffolds; and limited field of vision in both eyes. R. 71–77. Dr. Muzaffar also opined that Engel should avoid concentrated exposure to wetness, vibration, and hazards. R. 75. After the Commissioner denied his application at the state-agency level, Engel requested an administrative hearing before an ALJ. R. 106–07.

On October 10, 2019, ALJ William Shenkenberg held an evidentiary hearing on Engel's disability application. *See* R. 10–43.[2] Engel testified at the hearing. *See* R. 15–31, 40–41. Engel told the ALJ that he graduated high school in 1995 and that he obtained a bachelor's degree in electronics from ITT Technical Institute in 2001. R. 17. In the early 2000s, he worked for an amusement company that fixed arcade machines and jukeboxes. R. 23–25. Around 2006, he moved to Las Vegas and worked part-time (about twenty hours per week) as a maintenance service technician fixing computers and other equipment at casinos. R. 18, 22–23, 40–41. Engel stopped working the Las Vegas job in January 2016 following a criminal conviction, got divorced, and moved back to New Holstein, Wisconsin, where he lived with his retired parents. R. 15–16, 18, 22–23. At the time of the hearing, Engel was working about twenty-one hours per week for a temp agency cleaning up construction job sites. R. 20–21, 25–27. He worked every other day and spent his off days resting. R. 21, 27, 29. However, Engel never had to call in to work or leave early due to his health problems, though he "thought of it." R. 27.

Engel told the ALJ that he was not able to work full-time due to chronic fatigue. R. 19–22. According to Engel, he started noticing the fatigue back in 2012 or 2013, but "it wasn't as bad [then] as it is now." R. 19. Engel explained how he felt physically: "Whenever I do

---

[2] The ALJ postponed the first administrative hearing so Engel could obtain representation. *See* R. 44–51.

anything physical, it just is very draining. It's like somebody's sucking the energy out of me. I don't know how else to explain it. It's walking—walking uphill—anything out of the norm is very tiring." *Id.* Engel said he wasn't sure if he could do the Las Vegas job if he still had it. R. 18. When asked if he could do the temp agency job forty hours per week, Engel responded, "I don't believe so. . . . Because most days I'm physically drained by the end of the day, and it's taking longer to recover." R. 20. Engel further explained that he didn't work back-to-back days and that his current employer was very accommodating, allowing him to take a five- to ten-minute break "at least once an hour." R. 21, 26. Engel also indicated that his condition caused his eyes to droop, making it difficult to see, as well as muscle fatigue in all extremities. R. 19–22. Also, he didn't think he could perform a full-time, sit-down job because his neck would start to hurt after sitting "at a desk any more than an hour." R. 20–21.

The ALJ also heard testimony from a vocational expert. *See* R. 31–37. The vocational expert testified that a hypothetical person with Engel's age (forty years old at the time of his application), education (a high school degree and a bachelor's degree in electronics), and work experience (years fixing computers and other electronics) could not perform his past jobs as an electronics mechanic and a coin machine service repairer if he were limited to a restricted range of sedentary work. R. 32–35. That person could, however, work as an addresser, a call-out operator, or a charge account clerk. R. 34–35. The vocational expert testified that, "in the national economy," there were approximately 5,000 addresser jobs; 12,000 call-out operator jobs; and 6,000 charge account clerk jobs available. *Id.* The vocational expert testified that no jobs would be available if the hypothetical person was off task at least fifteen percent of the workday or missed at least two days of work per month. R. 35. Engel's lawyer did not ask the vocational expert any questions about his job-number estimates. *See* R. 36–37.

4

On December 3, 2019, the ALJ issued a written decision finding that Engel was not disabled. *See* R. 80–100. The ALJ applied the standard five-step analysis. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determined that Engel had not engaged in substantial gainful activity since his alleged onset date. R. 85. The ALJ determined at step two that Engel had two severe[3] impairments: mitochondrial myopathy and external ophthalmoplegia. R. 85–87. At step three, the ALJ determined that Engel did not have an impairment, or a combination of impairments, that meets or medically equals the severity of a presumptively disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 87.

The ALJ next assessed Engel's RFC. The ALJ found that Engel had the RFC to perform sedentary work with several additional limitations:

- He can never balance or climb ladders, ropes, or scaffolds;
- He can only occasionally crawl, climb ramps and stairs, and push and pull with his bilateral upper and lower extremities;
- He can frequently stoop, kneel, crouch, and handle and finger bilaterally;
- He is limited to occupations that require no more than occasional peripheral acuity;
- He should avoid concentrated exposure to extreme cold, wetness, and excessive vibration; and
- He can tolerate only occasional exposure to hazards.

R. 87–88. In assessing that RFC, the ALJ considered Engel's subjective allegations, the medical evidence, and the medical opinion evidence and prior administrative findings. *See* R. 88–93.

The ALJ determined that Engel's statements about the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record." R. 90. The ALJ acknowledged that Engel's impairments

---

[3] An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

impacted "his ability to perform physical work activities." *Id.* However, according to the ALJ, "the overall evidence of record" did not "substantially support" Engel's allegations that his symptoms "would preclude him from all competitive employment." *Id.* As the ALJ viewed the evidence, Engel's "weakness and subjective fatigue [were] reasonably provided for by limiting him to a reduced range of sedentary exertional work." *Id.*

The ALJ reached this finding based on the objective medical evidence, as well as "other evidence that [was] inconsistent with the disabling degree of limitation [Engel] allege[d]." R. 91. For example, the ALJ noted that Engel had consistently worked part-time since his alleged onset date. The ALJ also noted that Engel stopped working the job in Las Vegas in 2016 because of a criminal conviction, divorce, and relocation back to Wisconsin, not because his symptoms were worsening. The ALJ further noted that, at the time of the hearing, Engel was working three eight-hour days at a physically demanding job and that Engel hadn't missed any work due to his impairment-related symptoms. Finally, the ALJ noted that Engel stopped seeking vocational-rehabilitation services from the state "in part because he felt his criminal history was hindering his chances of being hired." R. 90 (citing Ex. 23E [R. 316–29], hearing testimony [R. 15–31, 39]).

The ALJ rejected Engel's lawyer's argument that Engel was able to maintain his job in Las Vegas only because he didn't work full, eight-hour days. R. 91. The ALJ noted that the job constituted substantial gainful activity according to social security regulations, that Engel was expected to work eight hours as necessary (but he almost always completed all his tasks in less than eight hours), and that there was no evidence Engel would have been unable to complete an eight-hour day if he had to. The ALJ further noted that, while Engel performed

6

that job at the light exertional level, the assessed RFC substantially reduced his exertional and postural demands.

The ALJ also considered Engel's daily activities. He noted that Engel attended to his personal hygiene needs, actively drove, performed household chores like cleaning and doing laundry, made meals for himself, used motorized lawn equipment, built his own computers, and read for enjoyment. R. 91 (citing Exs. B4E [R. 239–47], B8E [R. 265–72], hearing testimony). The ALJ also noted that, "[w]hile performance of these activities is not necessarily indicative of the ability to maintain full-time employment, each demands a reasonably good vision and other physical capacities to perform." R. 91.

The ALJ then explained the basis for each of the assessed limitations. *See* R. 91. According to the ALJ, the objective medical evidence, Engel's ability to maintain part-time employment, and Engel's activities of daily living demonstrated that he was able to perform a restricted range of sedentary work. The ALJ explained that he limited Engel's abilities to push, pull, crawl, stoop, kneel, crouch, and climb ramps and stairs to accommodate his complaints of fatigue and weakness. The ALJ further explained that he limited Engel to frequent handling and fingering to account for his below average grip and pinch strength. Lastly, the ALJ explained that he limited Engel to occupations that require no more than occasional peripheral acuity and limited his exposure to hazards to account for his loss of visual field and vision impairment.

The ALJ next addressed the opinion evidence. The ALJ found partially persuasive the opinions of the state-agency reviewing physicians, Dr. Shaw and Dr. Muzaffar. R. 91 (citing Exs. 2A [R. 53–63], 3A [R. 64–79]). The ALJ largely adopted the physicians' opinions as to

7

Engel's visual, postural, and environmental limitations. However, the ALJ thought the overall record better supported a finding of sedentary work as a baseline.

The ALJ also considered the opinions contained in the treatment notes of Paul Tuttle, MD, Engel's neurologist. R. 92 (citing Ex. 4F [R. 410–12]). In Dr. Tuttle's opinion, Engel "should not be involved in any occupation that requires physical strength in light of his myopathic condition." R. 411. Dr. Tuttle encouraged Engel "to get back into computers and IT." *Id.* The ALJ found that Dr. Tuttle's opinion had some persuasive value. R. 92. He explained, "Although vague in terms of restrictions for specific exertional activities, the opinion is based on his clinical examinations of the claimant, which note weakness of the extremities." *Id.*

Next, the ALJ considered the findings from a July 2018 functional capacity evaluation performed by Kyle Borowitz, an occupational and physical therapist. R. 92–93 (citing Ex. 8F [R. 413–18]). Based on Engel's performance on a series of functional tests, Borowitz concluded that Engel could "lift within the light/medium to medium physical demand level for an eight hour day." R. 413. The ALJ found that Borowitz's opinion had some persuasive value. R. 92. The ALJ noted that the opinion was based on a thorough evaluation by an experienced medical professional and was consistent with Engel's work activity demands throughout the relevant period. However, "based on the longitudinal record and in further consideration of [Engel's] subjective complaints of fatigue," the ALJ did not think Engel "would be able to sustain the lifting, carrying, standing, and walking demands required for light or greater work." R. 92–93.

Finally, the ALJ considered the third-party function report completed by Engel's mother. R. 93 (citing Ex. 7E [R. 257–64]). Engel's mother indicated that Engel was unable to

lift heavy objects, tired easily, and needed to rest often. R. 257. The ALJ found the mother's statements to be partially persuasive to the extent they were based on her first-hand observations. R. 93. However, the ALJ did not find persuasive the mother's specific statements as to the degree of Engel's limitation because they were subjective and there was no evidence the mother was an acceptable medical source under social security regulations.

Continuing the sequential evaluation process, the ALJ determined at step four that Engel was not able to perform any past relevant work. R. 93. At step five, the ALJ determined that, considering Engel's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Engel could perform. R. 93–94. Relying on the testimony of the vocational expert, the ALJ mentioned three examples: addresser, call-out operator, and charge account clerk. R. 94. Again, consistent with the vocational expert's testimony, the ALJ found that there were 5,000 addresser jobs; 12,000 call-out operator jobs; and 6,000 charge account clerk jobs available "in the national economy." *Id.* The ALJ found that those numbers constituted "a 'significant number' of jobs in the national economy [Engel] can perform." *Id.* Based on those findings, the ALJ determined that Engel had not been under a disability from his alleged onset date through the date of the decision. R. 94.

The Social Security Administration's Appeals Council denied Engel's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

On August 7, 2020, Engel filed this action seeking judicial review of the Commissioner's final decision denying his claim for social security disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was randomly assigned to me, and all parties subsequently consented to magistrate-judge jurisdiction under 28 U.S.C.

9

§ 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 4. It is now fully briefed and ready for disposition. *See* ECF Nos. 17, 24, 27.[4]

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also

---

[4] All subsequent citations to the parties' briefs are to the pages in the original document, not the page numbers provided by CM/ECF.

is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Engel v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Engel maintains that the RFC assessment is not supported by substantial evidence because the ALJ failed to accurately consider his vision limitations, failed to account for all his upper-extremity limitations, and failed to sufficiently explain why the ALJ rejected his allegation of disabling fatigue. Engel further maintains that the ALJ erred in finding at step

11

five of the sequential evaluation process that a significant number of jobs existed that someone with his RFC could perform.

## I.     Vision Limitations

Engel argues that the ALJ's RFC assessment did not accurately account for his vision limitations. He claims that the hypothetical presented to the vocational expert was potentially misleading because the ALJ limited Engel to jobs that require no more than occasional peripheral acuity without defining peripheral acuity, a term he says is not found in the *Dictionary of Occupational Titles* or the *Selected Characteristics of Occupations*. According to Engel, the ALJ should have limited him to occasional field of vision, as found by the state-agency reviewing physicians. Engel claims the ALJ also ignored his other vision problems, including occasional double vision, eyelid drooping, and issues with eye movement.

Engel has not demonstrated that the ALJ erred with respect to his vision limitations. First, the ALJ did not err when he limited Engel to occasional peripheral acuity rather than occasional field of vision. Engel acknowledges that the *Selected Characteristics of Occupations* defines field of vision as "[o]bserving an area that can be seen up and down or to the right or left while eyes are fixed on a given point." U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, App. C-2 (1993), *available at* https://obflegal.com/httpdocs/files/SCO.pdf. This definition is substantially similar to the commonly understood definition of peripheral vision—that is, the ability to see objects around you without needing to move your eyes or turn your head. There is no evidence that the vocational expert was confused by or did not understand the ALJ's chosen term. And Engel does not earnestly contend that a limitation to occasional peripheral acuity (i.e., sharpness in seeing objects not directly in front of him) failed to account for his field-of-vision

12

limitation; indeed, Engel asserts that the ALJ's terminology was only "potentially" misleading. ECF No. 17 at 14. Moreover, the ALJ noted throughout his decision that Engel's vision impairments impacted his vision field. *See* R. 89 (noting that Engel described needing "to keep his neck extended to look ahead due to the eyelids covering part of his visual field"), 90 ("The objective evidence shows the claimant has a loss of visual field."), 92 ("Like Dr. Shaw, Dr. Muffazar indicated the claimant would have limitations of the bilateral visual fields, but provided no specific restriction."). And the ALJ explained that he accommodated that restriction by limiting Engel to "jobs requiring only occasional peripheral acuity and avoidance of even moderate exposure to hazards." R. 90.

Second, the ALJ did not err in failing to include any other vision limitations in the RFC assessment. The ALJ explicitly considered that Engel sometimes complained about experiencing double vision. R. 88 ("As to specific work-related physical capacities, the claimant further alleged . . . he sometimes has blurry or double vision (Exs. 4E [R. 239–47], 8E [R. 265–72])."), 89 ("He further indicated history of double vision (Ex. 1F/17 [R. 348])."). Engel faults the ALJ for not addressing Dr. Shaw's (the reviewing state-agency physician at the initial level of review) finding of occasional double vision, but he fails to appreciate that was not one of Dr. Shaw's findings. When asked to explain Engel's visual limitations, Dr. Shaw wrote, "The claimant has ptosis in both eyes, opthmalmoplegia, occasional double vision, and facial weakness of unknown cause. His ptosis severely limits his field of vision." R. 60. But the only specific visual limitations he noted were limited field of vision in the left and right and that Engel should avoid even moderate exposure to hazards like machinery or heights. *See* R. 59–60. In other words, Dr. Shaw did not find that Engel's occasional double vision resulted in any restrictions beyond his limited field of vision. And Engel does not

explain what additional limitations his double vision caused; instead, he simply lists possible symptoms and concludes, without any further explanation or support, that "[h]aving double vision occasionally would be limiting in the workplace." ECF No. 17 at 15. Thus, Engel has not shown that the ALJ erred with respect to his double-vision complaints.

The ALJ also discussed Engel's complaints of eye drooping, including the two specific treatment notes he claims the ALJ ignored. Engel claims the ALJ ignored an opinion from Cat Burkat (an ophthalmologist specializing in plastic surgery), wherein she noted that "the eyelid drooping interferes with [Engel's] peripheral and superior vision." ECF No. 17 at 16 (citing R. 350). But that quote comes from Engel's subjective report of his symptoms; it is not Dr. Burkat's finding or opinion. *See* R. 350–51. Also, the ALJ *did* mention Engel's treatment with Dr. Burkat in August 2017. *See* R. 88–89 ("The medical treatment records document the claimant sought treatment in August 2017 for bilateral ptosis (drooping of the eyelids)." (citing Ex. 1F/22 [R. 353])), 89 ("The claimant consulted with various specialists, including an oculoplastic surgeon, who found decreased motility, abnormal levator muscle function, myopic fundi, and blockage of the pupils by the bilateral upper lids (Exs. 1F/17–18, 22 [R. 348–49, 353]).").

Engel claims the ALJ also ignored an opinion from Mary Hill (a nurse practitioner in the ophthalmology department), wherein she noted that "[Engel] reports that he cannot completely open his eyes." ECF No. 17 at 16 (citing R. 353). But again, that quotation is from Engel's subjective report of his symptoms, *see* R. 353, and the ALJ did discuss that progress note in his decision, *see* R. 88–89 (citing Ex. 1F/22 [R. 353]).

Moreover, throughout his decision, the ALJ acknowledged that Engel suffered from bilateral ptosis—the medical term for drooping eyelids. *See* R. 88 ("The claimant applied for

14

disability benefits due to . . . bilateral ptosis."), R. 88 ("The medical treatment records document the claimant sought treatment in August 2017 for bilateral ptosis."). The ALJ explained that he accommodated Engel's vision restrictions due to drooping eyelids by limiting his exposure to dangerous hazards. *See* R. 91–92. That assessment is consistent with Dr. Shaw's opinion, upon which the ALJ explicitly relied. *See* R. 92 (citing Ex. 2A [R. 53–63]). Engel does not explain how his ptosis resulted in additional limitations not adopted by the ALJ.

Finally, the ALJ expressly considered the findings of Dr. Tuttle (Engel's neurologist). Engel claims the ALJ did not address "in any substantive way" Dr. Tuttle's finding that Engel had drooping eyelids and a "marked restriction of extraocular movement." ECF No. 17 at 16 (citing R. 371). Although the ALJ did not mention those specific phrases when discussing Dr. Tuttle's treatment notes, he did extensively discuss Engel's treatment with Dr. Tuttle, *see* R. 86 (citing Ex. 3F/1 [R. 369]), 87 (citing Ex. 3F/1), 89 (citing Ex. 3F/1, 3 [R. 371]), 90 (citing 3F/1), 91 (citing 3F/1), and he expressly found somewhat persuasive Dr. Tuttle's opinion concerning Engel's functional abilities, *see* R. 92 (citing Ex. 7F [R. 410–12]). Dr. Tuttle recommended that Engel stop performing work that required physical strength and that he return to working on computers or in IT. *See* R. 410–12. Notably, Dr. Tuttle did not mention any specific visual limitations, despite his prior notes describing vision issues. That opinion is strong evidence that Dr. Tuttle's one progress note indicating a marked restriction in extraocular movement did not require additional restrictions in the RFC assessment.

In sum, I find that substantial evidence supports the vision limitations assessed by the ALJ and that Engel has not demonstrated the ALJ erred in failing to include additional vision restrictions in the RFC.

15

## II.  Upper-Extremity Limitations

Next, Engel argues that the ALJ failed to account for all his upper-extremity limitations. According to Engel, the July 2018 functional capacity evaluation found that he had "extremely slow" fine motor coordination. ECF No. 17 at 18 (citing R. 417). Also, Engel reported during the evaluation that he had upper-extremity weakness. ECF No. 17 at 18 (citing R. 415). Engel acknowledges that the ALJ noted both findings in his decision; however, he claims the ALJ erred by not including any corresponding limitations in the RFC assessment or by not explaining their exclusion. According to Engel, this error is material, as the three jobs identified by the vocational expert required frequent or greater handling and fingering. If all the findings from the evaluation had been included in the RFC, Engel says, those jobs—and potentially others—would have been eliminated.

Engel has not demonstrated that the ALJ erred in addressing the functional capacity evaluation. As Engel concedes, the ALJ discussed the evaluation in detail, including the two specific findings Engel challenges here. *See* R. 89–90 (citing Ex. 8F [R. 413–18]). First, the ALJ acknowledged that Engel "demonstrated lower level knuckle to shoulder and knuckle to overhead lifting due to early fatigue and weakness of the upper extremities." R. 89 (citing Ex. 8F). But upper-extremity weakness was not a finding of the functional capacity evaluation. It was Engel who said that he stopped "all material handling lifting tasks when his maximum physical capabilities were reached." R. 415. Engel explained "this as mostly indicative of upper extremity weakness." *Id.* In other words, the upper-extremity weakness comment was Engel's subjective report. Objective strength testing, however, showed that Engel had full strength and range of motion in all areas of his arms and hands. *See* R. 415–17. And the ultimate recommendation by Borowitz (the evaluator) was that Engel could perform the

16

lifting requirements of light/medium to medium work R. 413. Thus, the functional capacity evaluation does not support additional limitations to account for Engel's upper-extremity weakness, the ALJ did not err in failing to include such limitations in the RFC assessment, and the ALJ did not need to explain why those limitations were not included.

Second, the ALJ acknowledged that Engel's "fine motor coordination test placed him in the extremely slow category." R. 89 (citing Ex. 8F [R. 413–18]). But again, it is Engel—not the ALJ—who ignores the overall testing findings. After noting that Engel placed in the extremely slow category for fine motor coordination, the report states that Engel "was able to complete the placing and turning test with full functional bilateral hand dexterity without difficulty." R. 417. The ALJ discussed both findings in his decision, as well as Borowitz's ultimate conclusion that Engel could perform the lifting needed for light/medium to medium work. R. 89 (citing Ex. 8F). Engel does not point to any other evidence to support further restrictions in the RFC to account for his fine-motor coordination limitations. Thus, the ALJ did not err.

## III. Allegation of Disabling Fatigue

Engel also argues that the ALJ failed to build a logical bridge between the evidence and his conclusion that Engel did not suffer from disabling fatigue. According to Engel, the ALJ did not consider his testimony about his inability to work a full-time job. *See* ECF No. 23 at 19–20 (citing R. 20–21, 26). At the time of the administrative hearing, Engel was working about twenty-one hours a week, but he never worked back-to-back days. Engel told the ALJ that he was physically drained at the end of each workday, he needed a day off after working to recover, and his recovery was taking longer. Engel also told the ALJ that his employer allowed him to take a five- to ten-minute break every hour. Engel asserts this

17

testimony was consistent with his function reports, as well as the third-party function report completed by his mother.

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* SSR 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

18

Engel has not demonstrated that the ALJ erred when evaluating his subjective complaints of fatigue. First, the ALJ acknowledged Engel's complaints of fatigue and expressly accounted for them in his decision. The ALJ noted that Engel applied for disability benefits due to his alleged fatigue, R. 88 (citing Ex. 3E [R. 229–38]), sought medical treatment for muscle fatigue, R. 88–89 (citing Ex. 1F/22 [R. 353]), and attributed his lifting issues to fatigue during the functional capacity evaluation, R. 89 (citing Ex. 8F [R. 413–18]). The ALJ explained that Engel's subjective fatigue was accommodated by limiting him to sedentary exertional work with additional postural limitations. *See* R. 90–91. Dr. Tuttle's opinion that Engel should return to sedentary work, *see* R. 410–12, and the reviewing state-agency physicians' opinions that Engel was capable of a restricted range of light and sedentary work, respectively, *see* R. 53–78, support those findings. Thus, the ALJ largely credited Engel's fatigue allegation.

Second, the ALJ's decision to not fully credit Engel's fatigue symptoms is not patently wrong. The ALJ noted that Engel continued to work part-time since he first noticed his fatigue symptoms. R. 91. The ALJ also noted that Engel's job in Las Vegas ended due to his criminal conviction, divorce, and relocation back to Wisconsin, not because it became too demanding physically or because his symptoms worsened. The ALJ acknowledged that, at the time of the hearing, Engel was working three eight-hour days per week as a construction cleaner. Engel seems to suggest that the ALJ relied on this part-time work to conclude that he could work full-time. If he had, I would agree that the ALJ's conclusion lacked a logical basis. But that's not what the ALJ did here. The ALJ acknowledged Engel's part-time work in a physically demanding job and correctly noted that Engel had not missed any work or even left

early due to his impairments. It was reasonable for the ALJ to infer that someone with disabling fatigue would miss some time, even if he worked only every other day.

The ALJ considered other evidence that he thought was inconsistent with the degree of limitation alleged by Engel. For example, the ALJ noted that Engel discontinued vocational-rehabilitation services because he felt his criminal conviction was holding him back. R. 91. That admission demonstrates that Engel thought he was physically capable of working but that other factors were getting in the way of him landing a job. The ALJ also considered Engel's activities of daily living, noting that he was able to take care of his personal hygiene, drive, perform household chores like cleaning and doing laundry, cook for himself, mow the lawn, build his own computers, and read for enjoyment. The ALJ noted that those activities did not necessarily show that Engel was capable of full-time employment; however, each activity did demand "reasonably good vision and other physical capacities to perform." R. 91.

Overall, while I may not have decided this issue the same as the ALJ did, I cannot say that the ALJ's decision to not fully credit Engel's subjective complaints lacks explanation or support in the record.

## IV.    Step-Five Finding

Finally, Engel argues that substantial evidence does not support the ALJ's finding at step five of the sequential evaluation process.

An individual is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Lee v. Sullivan*, 988

F.2d 789, 792 (7th Cir. 1993) (quoting 42 U.S.C. § 423(d)(2)(A)). "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1566(a). "Once it is determined the claimant cannot perform his . . . prior work, the burden shifts to the [Commissioner] to show the claimant can engage in some other type of substantial gainful employment." *Lee*, 988 F.2d at 492 (citing *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)). "The Commissioner typically uses a vocational expert ('VE') to assess whether there are a significant number of jobs in the national economy that the claimant can do." *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (citing *Lee*, 988 F.2d at 793).

That's what happened here. A vocational expert testified at the administrative hearing that a person with Engel's limitations could work as an addressor, a call-out operator, and a charge account clerk. *See* R. 33–36. According to the expert, there were approximately 23,000 of those jobs "in the national economy." R. 34.[5] The ALJ relied on this testimony at step five, finding that the estimates provided by the vocational expert "constitute a 'significant number' of jobs in the national economy [Engel] can perform." R. 94.

Engel contends that the ALJ did not provide any rationale supporting his finding that 23,000 jobs in the national economy constitute a significant number of jobs and that current Seventh Circuit precedent does not resolve the issue. He's right, to a degree. Most of the Seventh Circuit cases have focused on regional (i.e., state or local), rather than national, job numbers. For example, in *Lee v. Sullivan* the Seventh Circuit found "unsupported by case law" the appellant's argument that 1,400 job positions in the greater Milwaukee metropolitan area

---

[5] Specifically, the vocational expert testified there were approximately 5,000 addressor jobs; 12,000 call-out operator jobs; and 6,000 charge account clerk jobs in the national economy. R. 34.

were not a significant number of jobs. *Lee*, 988 F.2d at 792, 794 (collecting cases). Likewise, in *Liskowitz v. Astrue*—a case frequently cited by the Seventh Circuit and other courts on this issue—"the VE expert testified that there were approximately 4,000 jobs in the Milwaukee area that a person with [the claimant's] functional limitations would be capable of performing." *Liskowitz*, 559 F.3d at 743. Though the claimant in that case had not argued that 4,000 jobs was an insignificant number of jobs, the court noted that such an argument would have been implausible, stating, "As few as 174 jobs has been held to be significant, and it appears to be well-established that 1,000 jobs is a significant number." *Id.* (collecting cases). Moreover, the Seventh Circuit cases that have addressed national numbers involved figures exceeding the 23,000 jobs we have here. *See, e.g.*, *Mitchell v. Kijakazi*, No. 20-2897, 2021 WL 3086194, 2021 U.S. App. LEXIS 21697, *8 (7th Cir. July 22, 2021) (30,000 jobs); *Butler v. Kijakazi*, 4 F.4th 498, 503–04 (7th Cir. 2021) (136,000 jobs); *Primm v. Saul*, 789 F. App'x 539, 546 (7th Cir. 2019) (110,000 jobs); *Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) (140,000 jobs).

In our case, however, it's unclear if the numbers provided by the vocational expert pertain to the number of jobs available in the nation as a whole or some other undefined region. The expert identified 23,000 potential jobs "in the national economy." R. 34. Recall that the Social Security Act "defines work in the national economy as encompassing 'work which exists in significant numbers either in the region where such individual lives or in several regions of the country.'" *Butler*, 4 F.4th at 505 (quoting § 423(d)(2)(A)). As in *Butler*, "[t]here is no reason to believe the VE was not using that statutory definition of 'in the national economy' when testifying as to jobs available nationwide." *Butler*, 4 F.4th at 505. Engel's lawyer at the hearing did not ask the vocational expert about his job-number estimates,

22

his methodology, or where the identified jobs were located. Thus, for all we know the numbers provided by the expert here *are* in fact regional numbers. And Engel does not contend that 23,000 jobs in a region are not a significant number of jobs.

In the end, it's immaterial to what region the vocational expert was referencing because I am convinced that the job numbers provided constitute a significant number of jobs under each of the theories presented to me. Again, it is undisputed that 23,000 jobs are a significant number of jobs in a region. *See, e.g.*, *Liskowitz*, 559 F.3d at 743 (finding that 4,000 jobs in the Milwaukee area constitutes a significant number of jobs). But let's suppose the vocational expert meant 23,000 total jobs available in the entire nation. Under *Liskowitz*, that is still a "significant" number of jobs. *See id.* ("[I]t appears to be well-established that 1,000 jobs is a significant number."). The same holds true if, using the methods proffered by Engel, we attempt to convert our national numbers to regional numbers. Engel suggests we can extrapolate the number of jobs available in Wisconsin from the number of jobs nationwide based on a percentage of the population, as the court did in *James A. v. Saul*, 471 F. Supp. 3d 856 (N.D. Ind. 2020), or based on a percentage of total jobs. I have doubts about the accuracy and reliability of either method, but let's go with it. After applying Engel's conversion methods, we're left with 408[6] and 448[7] jobs in Wisconsin, respectively. Those reduced figures remain significant under *Liskowtiz*. *See Liskowitz*, 559 F.3d at 743 ("As few as 174 jobs had been held to be significant.").

---

[6] 23,000 nationwide jobs x (5,820,000 [population of Wisconsin] / 328,000,000 [population of U.S.]). Engel's rounding left him with 414 jobs; the difference is immaterial here.

[7] 23,000 nationwide jobs x (2,709,940 [total number of jobs in Wisconsin] / 139,099,570 [total number of jobs in the U.S.]).

23

Engel contends that the 1,000-jobs figure from *Liskowitz* does not control because that case involved regional, not national, numbers. As other courts have pointed out, *see, e.g.*, *Ellis v. Kijakazi*, No. 20-CV-719, 2021 WL 3514701, 2021 U.S. Dist. LEXIS 149688, *11 (E.D. Wis. Aug. 9, 2021) (Joseph, M.J.), all the cases *Liskowitz* relied upon for that proposition involved local or state numbers. *See Lee*, 988 F.2d at 794 (1,400 jobs in the greater Milwaukee metropolitan area); *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 jobs in a nine-county area including Dayton, Ohio, where the plaintiff lived); *Barker v. Sec. of Health & Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs in Los Angeles metropolitan area); *Trimiar v. Sullivan*, 966 F.2d 1326, 1330–32 (10th Cir. 1992) (850 to 1,000 jobs in the state of Oklahoma); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs in the region in which the plaintiff lives). But the Seventh Circuit has cited with approval the 1,000-jobs figure and/or *Liskowitz* in cases that *did* involve national numbers. *See, e.g.*, *Mitchell*, 2021 U.S. Dist. LEXIS 21697, at *8 (citing *Weatherbee* as "noting that jobs with as few as 1,000 positions nationally are sufficient occupational base" in a case involving only national job numbers); *Weatherbee*, 649 F.3d at 572 (citing *Liskowitz* in a case involving national and state job numbers); *Primm*, 789 F. App'x at 546 (citing 1,000-jobs figure from *Liskowitz* in a case involving only national jobs). Engel and other courts have accused the Seventh Circuit of misapplying *Liskowitz* in cases (like *Mitchell*, *Weatherbee*, and *Primm*) involving national numbers. That's possible (and if so, maybe our case will provide the Seventh Circuit an opportunity to clarify its position on this issue). More likely, though, it appears from the Seventh Circuit's interpretation of its own prior holding in *Liskowitz* that 1,000 jobs nationally can be a significant number of jobs.

24

Other courts, both within this circuit and outside it, have found numbers less than the 23,000 national jobs we have here (assuming that's what the vocational expert meant when he said "in the national economy") to be a significant number of jobs. *See, e.g.*, *Dorothy B. v. Berryhill*, No. 18 CV 50017, 2019 WL 2325998, 2019 U.S. Dist. LEXIS 91276, *22–23 (N.D. Ill. May 31, 2019) (17,700 national jobs); *Anderson v. Astrue*, No. 08 C 4917, 2009 WL 2366088, 2009 U.S. Dist. LEXIS 66555, *38–39 (N.D. Ill. July 28, 2009) (10,800 national jobs); *see also Taskila v. Comm'r of Soc. Sec. Admin.*, 819 F.3d 902, 905–06 (6th Cir. 2016) (6,000 national jobs); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1996) (10,000 national jobs); *Garcia v. Comm'r of Soc. Sec. Admin.*, 817 F. App'x 640, 649–50 (10th Cir. 2020) (20,500 to 22,000 national jobs); *Sanchez v. Comm'r of Soc. Sec. Admin.*, 705 F. App'x 95, 99 (3rd Cir. 2017) (18,000 national jobs).

Engel cites two recent district-court cases from within this circuit questioning whether national numbers close to ours were significant.[8] In *James A.* a judge in the Northern District of Illinois concluded that, "as a matter of law, 14,500 jobs . . . in the national economy is not a significant number of jobs." *James A.*, 471 F. Supp. 3d at 860. Relying in part on that decision, a few months ago my colleague in the Eastern District of Wisconsin reversed a decision denying disability benefits because she was "not persuaded that 14,500 jobs available nationally is enough to be 'significant.'" *Ellis*, 2021 U.S. Dist. LEXIS 149688, at *16–17. Engel urges me to adopt the logic from *Ellis*. I respectfully decline. For one, I'm not sure I agree that the 1,000-jobs figure from *Liskowitz* applies only to regional job numbers or that the out-of-

---

[8] I have also located at least one more. *See John C. v. Saul*, No. 4:19-cv-04111-SLD-JEH, 2021 WL 794780, 2021 U.S. Dist. LEXIS 38701, *15–16 (C.D. Ill. Mar. 2, 2021) (reversing decision denying benefits because the Commissioner "has not pointed . . . to any binding authority holding that 20,000 jobs are significant, and with district courts coming to varying conclusions, the Court is not persuaded that the number is significant nationally").

circuit authority cited by the Commissioner is unpersuasive. Second, *Ellis* involved only 14,500 national jobs; we have nearly sixty percent more jobs here. Finally, in *Ellis* it was apparent *at the hearing* that the availability of jobs was somewhat problematic. As Judge Joseph noted, "[t]he VE herself testified that the number of available jobs was 'low.'" *Ellis*, 2021 U.S. Dist. LEXIS 149688, at *17. In fact, at the hearing counsel questioned the VE, who explained that there "are so few full-time ushers," which is why the number of available jobs was "so low." Tr. at 314–15, No. 20-cv-719, ECF No. 15-2 at 115–16. Here, by contrast, counsel accepted the VE's testimony about the number of jobs without question.

Finally, considering the specific facts of this case, I do not think that 23,000 jobs nationwide is an insignificant number. According to social security regulations, "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] live[s] are not considered 'work which exists in the national economy.'" 20 C.F.R. § 404.1566(b). The jobs identified here—addresser, call-out operator, and charge account clerk—do not appear to be concentrated in a few locations outside Wisconsin, where Engel lived at the time of the administrative hearing. Also, those jobs are merely representative of the types of jobs someone with Engel's limitations could perform; the vocational expert did not say those were the *only* jobs available to him.

In sum, I am persuaded that 23,000 jobs constitutes a significant number of jobs in the national economy. The ALJ therefore did not err in relying on the vocational expert's testimony at step five of the sequential evaluation process. In other words, that testimony is substantial evidence in support of the ALJ's step-five determination.

26

**CONCLUSION**

For all the foregoing reasons, I find that the ALJ's decision is supported by substantial evidence and that Engel has not demonstrated that the ALJ committed reversible error in assessing his RFC or determining that there were a significant number of jobs he could perform with that RFC. Thus, I **AFFIRM** the Commissioner's decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this <u>18th</u> day of October, 2021.

STEPHEN C. DRIES
United States Magistrate Judge

Case 1:20-cv-01206-SCD   Filed 10/18/21   Page 27 of 27   Document 28